In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00375-CV
_____

IN THE INTEREST OF H.R.S.

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 22-12-16955-CV

MEMORANDUM OPINION

This is a parental rights termination case. Following a bench trial

in the suit affecting the parent-child relationship (SAPCR), the trial court

terminated the parent-child relationship between H.R.S. (Hunter) and

his mother (Mother).[1] When the trial ended, the trial court found by clear

_____

[1]We have used pseudonyms for the names of the minor and his mother to protect Hunter's identity. Tex. R. App. P. 9.8 (Protection of Minor's Identity in Parental-Rights Termination Cases). The trial court also terminated the parental rights of three men the Department alleged

1

and convincing evidence that six statutory grounds existed to support terminating Mother's relationship with Hunter and found that terminating her rights to Hunter is in Hunter's best interest.[2]

In one issue, Mother challenges the order terminating her parental rights, arguing the evidence is legally and factually insufficient to support the trial courts predicate findings under: (1) subsection (D), that she knowingly placed or knowingly allowed Hunter to remain in conditions or surroundings that endangered his physical or emotional well-being; (2) subsection (E), that she engaged in conduct or knowingly placed Hunter with persons who engaged in conduct that endangered his physical or emotional well-being; (3) subsection (N), that she constructively abandoned Hunter; (4) subsection (O), that she failed to comply with the provisions of a court-ordered-family-service; (5)

---

in its petition as the men who might be Hunter's father. None of the alleged fathers filed notices of appeal. *See* Tex. Fam. Code Ann. § 161.002(b)(3) (authorizing the rights of alleged fathers to be terminated for children who are not yet one-year old if the petition seeking to terminate the parent-child relationship is filed before the child's first birthday or if an alleged father hasn't registered with the paternity registry).

[2]*Id*. §§ 161.001(b)(1)(D), (E), (N), (O), (P), (R); 161.001(b)(2).

subsection (P), that she used a controlled substance in a manner that endangered Hunter's health or safety and failed to complete a court-ordered, substance-abuse-treatment program; and (6) subsection (R), that she was a cause of Hunter's being born addicted to alcohol or a controlled substance, other than a controlled substance legally obtained by prescription. Mother also challenges the trial court's finding under section 161.001(b)(2) that terminating her rights to Hunter is in Hunter's best interest.[3] Relying on these findings, the trial court signed a judgment terminating Mother's relationship with Hunter, and subsequently Mother filed a timely appeal.

We address Mother's arguments challenging the trial court's subsections (D) and (E) findings first and will not reach Mother's remaining arguments, which (broadly construed) challenge the trial court's predicate findings under subsections (N), (O), (P), and (R).[4] On

---

[3]*Id.* §§ 161.001(b)(1)(D), (E), (N), (O), (P), (R); 161.001(b)(2).

[4]*Id.* §§ 161.001(b)(1)(D) (conditions-based endangerment), (E) (conduct-based endangerment), (N) (constructive abandonment), (O) (failed to comply with court-ordered family service plan), (P) (used a controlled substance in a manner that endangered a child and failed to comply with a court-ordered substance abuse treatment program), and (R) (caused a child to be born addicted to alcohol or a controlled

appeal, an appellate court need not reach every argument raised by the appellant if the evidence is sufficient to support one of the predicate grounds on which the trial court relied to terminate the parent-child relationship and the evidence also supports the trial court's best-interest finding because when the evidence supports a predicate finding and a best-interest finding the trial court's order terminating a parent's relationship with their child will withstand the parent's sufficiency challenge on appeal.[5]

Because we conclude the evidence admitted in the trial is sufficient to support the trial court's condition- and conduct-endangerment findings, we overrule Mother's sole issue and affirm the trial court's Order of Termination.

## Background

Our discussion of the background focuses on the evidence relevant to Mother's placing, allowing, or engaging in conduct that endangered

---

substance, other than a controlled substance legally obtained by a prescription).

[5]*In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. R. App. P. 47.1 (allowing courts of appeals to limit their discussions in opinions to the issues necessary to the disposition of the appeal).

Hunter's physical or emotional well-being since a trial court's subsection (D) and (E) findings, when challenged by a parent, must be reviewed on appeal.[6]

The appellate record shows that within a week of Hunter's birth, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship with the Montgomery County District Clerk. The Montgomery County District Clerk assigned the case to the County Court at Law Number 3.[7] The Department's petition is supported by an affidavit signed by Sophia Cortez, a CPS Investigator employed by the Department. Among other things, Cortez's affidavit alleges that after

---

[6]*See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (holding that given the potential collateral consequences of a trial court's condition-based and conduct-based endangerment findings under section 161.001(b)(1)(D) or (E), a parent has a liberty interest in having these findings reviewed on appeal and that a failure of an appellate court to review them would run afoul of a parent's fundamental liberty interest in parenting).

[7]The county courts at law in Montgomery County have concurrent jurisdiction with district courts in family law cases. So even though the district clerk file stamped the petition, the district clerk serves as the clerk of the county courts at law for the cases in which the district and the Montgomery County courts at law have concurrent jurisdiction. *See* Tex. Gov't Code Ann. § 25.1722(a)(1), (e).

Hunter was born, a social worker contacted the Department and advised the Department that: (1) Hunter's mother told the hospital upon her admission that she had used heroin but denied she was currently using drugs; (2) Mother "was positive for opiates, amphetamines, and benzodiazepines[;]" (3) the day after Mother was admitted to the hospital and gave birth to Hunter, Mother left the hospital against medical advice; (4) when Mother returned to the hospital, she was "under the influence" and "found to have several needles in her possession and drug residue was found in her bag[;]" and (5) when Mother returned to the hospital, she admitted "to heroin use[,]" and "that the mother is now in the intensive care unit[,] . . . is intubated, in respiratory failure, having drug withdrawals, and [] it is unclear whether or not she will survive." Cortez's affidavit also states that Mother has a criminal history, including charges for possession of marijuana and a controlled substance, and Cortez also advised the Department that Mother has a history with Child Protective Services. Cortez's affidavit concludes by stating that Hunter's mother "has continued to show a pattern of drug use and has tested positive for drugs with the births of all of her children. The child, [Hunter], is now

6

suffering from drug with draws (sic) due to his mother's (mother's name deleted) abuse."

The trial court granted the Department's petition requesting that Hunter be temporarily removed from Mother's custody, the trial court placed Hunter into the temporary custody of the Department, and subsequently, the judge conducted a full adversary hearing. At the conclusion of the full adversary hearing, the judge signed temporary orders requiring that Mother, among other things, "comply with the requirements" of "the Department's original, or any amended, service plan during the pendency of this suit." The Department's family service plan required Mother, among other things, to "engage in and complete a drug and alcohol assessment with a licensed service provider . . . and follow all recommendations given to her from this assessment and [ ] actively participate and complete all recommended services."

In November 2023, the trial court called the case to trial. Three witnesses testified during the trial: (1) the Department's caseworker, Signora Hadnot; (2) the Court Appointed Special Advocate, whom we will

7

call the CASA; and (3) Hunter's foster mother (*Pat*).[8] In addition to the testimony of these witnesses, the trial court admitted nineteen exhibits into evidence during the trial, including Petitioner's Exhibit 7, an exhibit that contains the medical records the Department obtained from HCA Kingwood Medical Center (HCA Kingwood) in Kingwood, Texas, the hospital in which Hunter was born.

Hunter's medical records from HCA Kingwood were admitted into evidence without objection during the trial. The records show that Hunter was born at HCA Kingwood in December 2022. His mother was twenty-eight years old when he was born. The doctor who delivered Hunter admitted him into the hospital's neonatal intensive care unit (NICU) the day he was born. Hunter's doctor diagnosed Hunter as a preterm newborn (34 weeks of gestation), and his medical records show that he had anemia, neonatal withdrawal symptoms from his mother's use of drugs, "affects from his mother's use of opiates," and he tested positive for opiates at birth. Hunter's admission history also shows that

---

[8]A pseudonym.

during mother's pregnancy with Hunter, Hunter's mother didn't receive any prenatal care.

Based on Hunter's doctor's diagnosis of "Drug Withdrawal Syndrome-newborn-mat[ernal] exp[osure,]" his doctor started him on a morphine treatment therapy. Hunter's medical records show that he was then slowly weaned from the morphine over the next thirty days. The day that the morphine therapy started, Hunter's records reflect that his "mother left [the hospital] against medical advice yesterday [around eight o'clock pm]."

That said, Hunter's medical records also show that Mother returned to the hospital the following day "concerned about her blood pressure and [] complaining of severe abdominal pain."[9] The notes in Hunter's medical records state that "Mother with Heroin dependency and admits to using half a gram of heroin a day." Hunter's records reflect that

---

[9]Hunter's mother's medical records were not offered or introduced into evidence in the trial. Mother did not testify in the trial. For those reasons, the only information about Mother's medical treatment is the information that was incidentally included in the records the Department obtained from HCA Kingwood tied to Hunter's birth, records the Department obtained based on its use of a medical authorization that was signed by Hunter's custodian.

Mother told a social worker at the hospital that she wanted "to go to [a certain detox facility, which Mother named] for detoxing from IV heroin use."

On the third day of Hunter's stay in the NICU, according to Hunter's records, Mother was admitted into the hospital's intensive care unit "for severe agitation." When Mother failed to respond after she was given doses of several drugs while in intensive care, she was intubated. The medical records in evidence reflect that a social worker at the hospital tried to locate a drug treatment center that would accept Mother as a patient once the physician responsible for admitting Mother to the hospital determined she was "medically stable." Hunter's medical records show that the endotracheal tube that Mother was given to help her breathe was removed either later the day she was intubated or the next day.[10]

---

[10]As previously mentioned, the information in Hunter's records about Mother's treatment isn't complete because the records in evidence don't include records, if any, the Department may have obtained if Mother signed a medical authorization that authorized the Department to obtain her medical records. Also, Mother's attorney never offered Mother's medical records into evidence during the trial.

Hunter was in the NICU for nearly five weeks before he was discharged by the hospital into the custody of the Department. When Hunter was discharged, the Department placed him in a foster home. The discharge summary from Hunter's hospital records states that he was "[d]oing well clinically at time of discharge." It also notes that when Hunter was born, he had "increased tone and irritability [resulting from his] illicit drug exposure," which improved after he was treated with the medication and "nonpharmacological comfort measures" while in the NICU. The report concludes Hunter "is at risk for neonatal abstinence syndrome."

We turn next to the testimony that the trial court heard during the trial. The Department's attorney called Signora Hadnot, the Department's caseworker, as its first witness. Hadnot explained that in January 2023, she was assigned to work on Hunter's case. Without objection, Hadnot testified that during a status hearing in February 2023, Mother testified that her drug of choice was heroin and that Mother also testified she began using heroin when she was twenty-years old. Hadnot explained the Department's service plan required Mother to

11

participate at the Department's request in random urinalysis and hair follicle tests, but that Mother failed to comply with the Department's requests that Mother be tested for drugs.

According to Hadnot, she was present at the courthouse for a permanency hearing in Hunter's case on September 21, 2023, when she saw Mother outside the courtroom before a permanency hearing in the case, which had been scheduled to begin that day. According to Hadnot, when she saw Mother, Mother "seemed to be incoherent, slurring her words, something – she – she was not in the right state." The trial court's docket sheet shows that the parties' attorneys appeared for the permanency hearing but that "No parents appeared[;] . . . Parties entered in Rule 11 recently with an agreement for Mother to take a drug test, but she did not appear for that; She has not taken one drug test during the case[.]"

When Hadnot testified, she also described the information in Hunter's medical records including the fact that the records note Mother's use of drugs. But since we have already described most of the relevant information tied to the drug use that is in these records, we will

not repeat that same information here to the extent that Hadnot relied on the information in the medical records in describing Mother's use of drugs. In addition to emphasizing that the medical records suggest that Mother used heroin while she was pregnant with Hunter, Hadnot testified that based on the investigation that she conducted in Hunter's case, she learned that Mother has two other children but doesn't have custody of either child. Hadnot explained that Mother acknowledged that she had given these two children up for adoption. According to Hadnot, she had asked Mother for the information she needed to contact the adoptive parents of these two children, but Mother had not given her sufficient information to find and contact the adoptive parents.[11]

Hadnot also addressed what Mother completed and didn't complete of her family service plan. According to Hadnot, Mother completed the parenting class, drug assessment, and psychological evaluation, but she never successfully completed the drug treatment plan. Hadnot also testified that the service plan required that Mother participate in random

---

[11]In Hunter's medical records, the maternal history section of the records state that Mother "[h]as a 7[-] and 2[-]year old. She does not have custody of either child."

urinalysis and hair follicle tests, but Mother had not complied with the plan's requirements by submitting to these tests. For example, Hadnot told the court that even though Mother had enrolled and participated in a drug treatment program, Mother refused to comply with her request to share the tests results Mother received on the drug tests she was given when she was enrolled in that program. [12]

Hadnot also described the problems she had during the pendency of the case communicating with Mother. For example, Hadnot said that Mother didn't consistently maintain her visitation schedule with Hunter after the trial court ordered him removed from Mother's custody and before the case went to trial. According to Hadnot, during August 2023

---

[12]Hadnot did acknowledge receiving a copy of one drug screen test that Mother took while she was in a drug treatment program. Yet Hadnot did not explain whether Mother is the person who provided her with the copy of the test result, what the result was on that test, and Hadnot was never asked to explain where she acquired the information showing what Mother's result was on the test. The evidence that was admitted during the trial shows that during the time that Mother was in a drug treatment program, drug tests were administered according to the program's protocol "on a regular basis." So, the trial court could have concluded have were multiple test results available from the program that Mother failed to provide to the Department despite Hadnot's request that Mother provide the Department with the results of all her tests.

Mother's visits "really started falling off[,]" as that month Mother "began having no shows" even though Mother would confirm a visit "and then not show up." In the three-months period before trial, Hadnot said, Mother did not visit Hunter at all because the court had ordered Mother's visits suspended until she both submitted to a drug screen and obtained a clean result.

Hadnot told the court that Mother failed to cooperate with the Department's investigation in several other respects. In an unannounced visit in October 2023, Hadnot said she arrived and found that she couldn't gain entrance to the property where Mother was living because the gate to the property was secured by a chain, which was locked. According to Hadnot, when she called Mother and Mother found out that Hadnot was at the residence and needed someone to unlock the gate, the call suddenly disconnected. After the incident at the gate, Hadnot said her communications with Mother had been limited to text messages as Mother "did not talk to me over the phone." Even though Hadnot agreed that Mother sent text messages to her in response to the text messages she sent Mother, Hadnot characterized the responses that Mother sent

15

her by text as consisting of nothing more than excuses for why Mother couldn't meet Hadnot in person.

When asked what concerns the Department would have if Hunter were to be returned to Mother, Hadnot testified that "the child would not be safe. The child would be – I think the child would be in danger with her current state of drug use." Hadnot testified that the Department's plan is for Hunter to be adopted by his foster placement, which she described as "very much" in his best interest.

On cross-examination, Mother's attorney established that Mother had enrolled in and was receiving treatment and counseling in a methadone-maintenance treatment program and recently enrolled in college. A one-page letter, dated in April 2023, which is from the treatment program in which Mother was enrolled, was marked as an exhibit and admitted into evidence during the trial. The letter shows that as of April 20, 2023, Mother had been in the treatment program since February 2, 2023. The letter also states:

> This treatment is not a form of detoxication, and in a patient with long-term opioid dependence, it is reasonable to expect long-term and perhaps indefinite maintenance on OPIOD Pharmacotherapy Treatment (METHADONE) along with

16

counseling. Failure to pursue this course will result in a high probability of return to short-acting opiate drugs in order to prevent withdrawal symptoms. P[atien]t has been compliant with our program."

The Department's attorney called Hunter's Court Appointed Special Advocate, his CASA, to develop information from the CASA to support the Department's claims. First, Hunter's Casa testified that she understood the Department's goal in Hunter's case was for his current foster family to adopt him, and she said that she was in "agreement with that" goal. Second, Hunter's CASA testified that Hunter's foster parents love him, take care of him, and they meet his physical and emotional needs. Third, the CASA told the court that she had spoken to Mother, and that in her opinion it would not be safe to return Hunter to her because Mother,

> has not shown responsibility in getting herself clean. She is not able to stay out of criminal mischief, criminal problems . . . [Mother] has never stated a permanent address to me to even be able to visit and see if she even has an environment conducive to taking care of the child.

As to the criminal mischief the CASA discussed, the exhibits admitted into evidence in the trial include exhibits that show Mother was arrested several times after Hunter was born. In May 2023, Mother was

arrested for theft and for driving while intoxicated. She pleaded guilty to the theft and driving while intoxicated charges, and the trial court sentenced her to serve twenty-two days in jail, with credit for time served. On October 5, 2023, Mother was indicted for possessing methamphetamine on or about May 28, 2023, a third-degree felony. Later that month on the indictment for possession of meth, Mother pleaded guilty, the trial court deferred adjudicating her guilt, and placed Mother on community supervision for three years. On or about September 25, 2023, Mother was charged with evading arrest. That charge was dismissed after Mother pleaded guilty in the cases we have already described.

The CASA testified that she agreed that Mother's rights should be terminated and that, in her opinion, it would be in Hunter's best interest if the court were to terminate Mother's parental rights. On cross-examination, the CASA agreed she had seen Mother when Mother exercised her visitation rights. The CASA conceded it was obvious that Mother loves Hunter and that Mother had begun to bond with him.

The Department called Pam, Hunter's foster mother, as the Department's last witness. Pam testified that Hunter had been in her home and in her care since being released from the hospital in January 2023. Pam testified that she said she was aware that the Department's goal was for her to adopt Hunter, and she told the court that she was certain that she and her husband "want to adopt[.]" Pam explained that since Hunter has lived in her home, she has taken care of him and all of his physical and medical needs. She also told the court that Hunter is "loved by all of our friends, family, I mean, everyone. He's very loved."

At the conclusion of the trial, the trial court orally announced that it would find that the evidence supported terminating Mother's parent-child relationship with Hunter under subsections (D), (E), (N), (O), (P), and (R).[13] The trial court also found that terminating Mother's parental rights to Hunter is in Hunter's best interest.[14] On November 14, 2023,

---

[13]Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E), (N), (O), (P), (R).
[14]*Id.* § 161.001(b)(2).

the trial court signed an Order of Termination, which tracks the findings the trial court orally pronounced in the trial. [15]

## Standard of Review

In Mother's sole issue, she argues the evidence is legally and factually insufficient to support the trial court's order terminating her parent-child relationship with Hunter. At trial, the Department had the burden to prove through clear and convincing evidence that Mother's relationship with Hunter should be terminated. [16] *Clear and convincing evidence* is statutorily defined: it means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." [17] In cases tried to the bench, the trial court acts as the factfinder and decides which

---

[15]The case was tried to an associate judge. However, the Clerk's Record contains a Rule 11 agreement in which the parties signed a stipulation waiving their rights to appeal the associate judge's rulings to the referring court (which in this case would have been the judge of the County Court at Law Number 3, although no order of referral was included in the appellate record). Yet while the parties waived their right to appeal the associate judge's rulings to the referring court, they expressly reserved their right to appeal from any final order or judgment that resulted from the ruling or recommendation of the associate judge.

[16]*Id.* § 161.001(b).

[17]*Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

witnesses are credible, how to weigh the testimony, and resolves any conflicts and inconsistencies that may exist in the testimony.[18] Yet even though a clear and convincing evidence standard applies to our review, "[a]ll evidentiary standards, including clear and convincing evidence, recognize the relevance of circumstantial evidence."[19]

When reviewing for legal insufficiency, we review all the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."[20] We assume the factfinder resolved the disputed facts in a manner that favors the finding it made if a reasonable factfinder could have resolved the issue that way.[21] For that reason, we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.[22] If we conclude that no reasonable

---

[18]*See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *In the Int. of D.P.*, No. 09-22-00048-CV, 2022 Tex. App. LEXIS 5279, at *24 (Tex. App.—Beaumont July 28, 2022, pet. denied).
[19]*In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015).
[20]*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).
[21]*Id.*
[22]*Id.*

factfinder could form a firm belief or conviction that the fact in dispute is true, we must find the evidence legally insufficient.[23]

On the other hand, under a factual sufficiency review, the reviewing court "give[s] due deference" to findings the trial court made in the trial.[24] In other words, the reviewing court must avoid supplanting the judgment the factfinder made with a "judgment of its own."[25] The question that is to be answered in the appeal is "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations."[26] "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."[27] Under factual sufficiency review, the court reviewing the evidence must avoid applying a standard that requires the Department to prove beyond reasonable doubt that the parent engaged

---

[23]*See In re J.L.*, 163 S.W.3d at 85.
[24]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (cleaned up).
[25]*Id.*
[26]*In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).
[27]*In re J.F.C.*, 96 S.W.3d at 266.

22

in the conduct that ran afoul of one of the twenty-six grounds the legislature listed for terminating the parent-child relationship.[28]

On appeal, to support an argument that the evidence is factually insufficient to support a verdict, the parent challenging the verdict should explain why the factfinder could not have credited the evidence the parent challenges in favor of the finding the parent disputes.[29] A reviewing court will not find the evidence factually insufficient unless "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" in favor of its finding.[30]

In her appeal, Mother also challenges the trial court's best-interest finding. In reviewing a best-interest finding, we examine the record for the evidence that addressed the various, non-exclusive factors relevant to a child's best interest against the nonexclusive factors the Texas

---

[28]*In re H.R.M.*, 209 S.W.3d at 108.
[29]*See In re J.F.C.*, 96 S.W.3d at 266.
[30]*Id.* at 267.

23

Supreme Court identified in *Holley v. Adams.*[31] Yet the factors set out in

*Holley* aren't exclusive, and the evidence in the record tied to the

factfinder's decision-making process in reaching its best-interest finding

need not include evidence that addressed all nine *Holley* factors.[32]

---

[31]*See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). In *Holley*, the Texas Supreme Court used these factors when reviewing the best-interest finding:

- the child's desires;

- the child's emotional and physical needs, now and in the future;

- the emotional and physical danger to the child, now and in the future;

- the parenting abilities of the parties seeking custody;

- the programs available to assist the party seeking custody;

- the plans for the child by the parties seeking custody;

- the stability of the home or the proposed placement;

- the parents' acts or omissions that reveal the existing parent-child relationship is improper; and

- any excuse for the parent's acts or omissions.

[32]*In re C.H.*, 89 S.W.3d at 27 (noting the lack of evidence on some *Holley* factors "would not preclude a factfinder from reasonably forming a strong belief or conviction that termination is in the child's best interest").

Analysis

*The Endangerment Findings*

Mother combined all her arguments in a single issue even though she challenged all seven of findings the trial court relied on to terminate her rights in the brief that she filed to support her appeal.[33] We address Mother's arguments challenging the trial court's condition-based and conduct-based endangerment findings first to decide whether the evidence supports either of those findings before addressing the arguments Mother raises challenging the trial court's other findings.[34]

While similar, the condition-based and conduct-based subsections, subsection 161.001(b)(1)(D) and (E), are not identical. Under subsection (D), the Department had to prove by clear and convincing evidence that Mother knowingly placed Hunter or allowed Hunter to remain in conditions or surroundings that endangered his physical or emotional well-being.[35] Under subsection (E), the Department had the burden to

---

[33]Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E), (N), (O), (P), (R); 161.001(b)(2).
[34]*Id.* § 161.001(b)(1)(D), (E).
[35]*Id.* § 161.001(b)(1)(D).

25

prove by clear and convincing evidence that Mother engaged in conduct or knowingly placed Hunter with persons who engaged in conduct that endangered his physical or emotional well-being.[36] As used in subsections (D) and (E), the commonly understood meaning of the term *endanger* is "to expose to loss or injury; to jeopardize."[37]

Generally, a parent's conduct that subjects a child to a life of uncertainty and instability has engaged in conduct that endangers their child's physical and emotional well-being.[38] That said, proof of endangerment requires "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment[,]" yet "it is not necessary that the conduct be directed at the child or that the child actually suffers an injury."[39] Rather, endangering a child based on a parent's conduct means "to expose a child to loss or injury or to jeopardize

---

[36]*Id.* § 161.001(b)(1)(E).

[37]*In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021); *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citing *Endanger*, Webster's New Twentieth Century Dictionary of the English Language 599 (1976)).

[38]*See In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009).

[39]*Boyd*, 727 S.W.2d at 533.

a child's emotional or physical health."[40] And importantly, the parent's endangering conduct need not occur in the child's presence, so conduct relevant to a factfinder's decision may include conduct that occurred before or after the child the subject of the Department's suit was born.[41] Generally, from evidence of a parent's past conduct showing the parent subjected a child to a life of uncertainty and instability, a factfinder may infer that the parent will continue to engage in the conduct and the same conduct will endanger another child's physical and emotional safety and well-being.[42]

Here, the evidence shows that when Hunter was born, Mother was an IV heroin user who had been using heroin for approximately eight years. To be sure, after Hunter was born, Mother enrolled in a methadone treatment program and enrolled in college. Yet the most current document that Mother's attorney presented in the trial to establish that

---

[40] *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

[41] *See J.O.A.*, 283 S.W.3d at 345; *In the Int. of B.P.*, No. 09-22-00031-CV, 2022 Tex. App. LEXIS 4277, at *25 (Tex. App.—Beaumont June 23, 2022, no pet.).

[42] *J.O.A.*, 283 S.W.3d at 345; *In re D.P.*, 2022 Tex. App. LEXIS 5279, at *25.

Mother was still pursing treatment was a document dated April 20, 2023. The trial occurred in late November 2023. As the factfinder, the trial court wasn't required to infer that Mother had gained control over her addiction when she didn't appear for the trial and didn't present evidence showing that she was in a drug treatment program or that she had ever successfully completed one. Additionally, Mother didn't present the trial court or the Department with any evidence that she had obtained negative results on drug screens after April 20, 2023, and Mother's attorney didn't call any witnesses to refute the testimony of the Department's witnesses who questioned whether Mother had gained control over her addiction to drugs.

As is often the case in appeals arising from trials in cases that involve parents addicted to illicit substances, whether a trial court's decision is reasonable turns to consideration that may include: (1) the evidence of nature and degree of the evidence about the parent's abuse of a substance or addiction; (2) the degree to which a reasonable factfinder might believe (or disbelieve) that the parent has gained control over the parent's historical patterns as they relate to that parent's addiction or

abuse of a drug; and (3) whether the trial court could have reasonably inferred from the direct and the circumstantial evidence that the parent's substance abuse issues endangered the child.

In our opinion, there is ample evidence in this record to support the trial court's subsection D and E findings. A pattern of drug abuse will support a finding of conduct endangering a child under subsection D or E even if there is no evidence that such drug use caused a physical or actual injury to the child.[43] For example, a history of illegal drug use and drug-related criminal activity is conduct that subjects a child to a life that is uncertain and unstable, and the uncertainty and instability tied to the parent's drug use endanger the child's physical and emotional well-being.[44] A parent's continued drug use when the custody of the parent's

---

[43]*Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

[44]*In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ); *see also In re S.R.*, 452 S.W.3d 351, 361-62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination

child is in jeopardy is also evidence that may support a trial court's finding of endangerment.[45] Further, a factfinder may reasonably infer that a parent's failure to submit to court-ordered drug tests indicates that the parent avoided testing because the parent was using illegal drugs.[46] A parent's drug use, incarcerations, incidents of domestic violence, criminal history, and evidence that the parent's employment and housing were unstable prior to and during the case creates a course of conduct from which a factfinder may determine that the parent endangered the child's emotional and physical well-being.[47]

The medical records allowed the trial court to conclude that when Mother had Hunter, she was an IV heroin addict with an eight-year history that involved her addiction to that drug. Although the evidence

---

under subsection E because it "exposes the child to the possibility that the parent may be impaired or imprisoned[]").

[45]*See In re S.R.*, 452 S.W.3d at 361-62 (citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253, 254 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc)).

[46]*In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

[47]*See In re M.C.*, No. 09-18-00436-CV, 2019 WL 1561824, at *6 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op); *see also In re D.O.*, 338 S.W.3d 29, 36-37 (Tex. App.—Eastland 2011, no pet.); *In re V.V.*, 349 S.W.3d 548, 553-54 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

shows Mother had enrolled in a methadone treatment program, it also showed that to maintain control over her heroin addiction, Mother needed to pursue methadone maintenance on a long-term if not permanent basis or a high probability existed that she would return to opiate drugs to prevent suffering symptoms of withdrawal. The trial court heard testimony that Mother wasn't allowed to exercise her rights of visitation in the three months leading up to the trial because she failed to provide the Department with a negative drug screen. And while Mother enrolled in a methadone treatment program after the Department filed suit, the evidence Mother presented shows that she was in that program as of April 23, 2023, but doesn't show whether she was still pursuing a methadone therapy and counseling program between June 2023 and the trial in November 2023.

The trial court could have also reasonably believed that Mother's addiction harmed Hunter. Mother's addiction left Hunter, according to Hunter's medical records, at risk of "neonatal abstinence syndrome" upon being discharged from the hospital and even after he was treated and weaned from methadone after he was hospitalized for over a month. The

31

trial court also heard testimony that Mother had a criminal history, had two other children that she had given up for adoption, and that all three of Mother's children were born during the eight-year period in which she had been using heroin based on the history the trial court heard about Mother's use of drugs. Given medical records showing that Hunter tested positive for opiates after he was born, Mother's history of heroin use for eight years, her recent history of daily IV heroin use, her failure to obtain neonatal treatment while she was pregnant with Hunter, the lack of evidence that she sought a drug treatment program after she became pregnant with Hunter and didn't' enroll in one until Hunter was removed from her care, the lack of evidence to show that prior to trial Mother had successfully completed a drug treatment program, and the lack of evidence that Mother had recent tests results that were negative for the presence of drugs, we conclude the trial court could have formed a firm belief or conviction that Mother knowingly allowed Hunter to remain in conditions that exposed him to the effects of Mother's use of illicit substances—including heroin—and that the conditions both in the past and in the future if were to be returned to her would endanger and had

in the past endangered his physical or emotional well-being. [48] We further conclude that this same evidence allowed the trial court to form a firm belief or conviction that Mother knowingly engaged in a course of conduct that in the past endangered and were he to be returned to her would endanger Hunter's physical or emotional well-being. [49]

Having determined that the evidence is legally and factually sufficient to support both predicate endangerment findings under subsection (D) and (E), we need not address whether the evidence would also support the trial court's predicate findings of one or more of subsections (N), (O), (P), or (R), the remaining predicate findings that Mother challenged in her brief. [50]

*Best-Interest Finding*

Next, we address Mother's argument that the evidence is legally and factually insufficient to support the trial court's best-interest finding.

---

[48]*See J.O.A.,* 283 S.W.3d at 346; *In the Int. of J.O.*, No. 09-16-00485-CV, 2017 Tex. App. LEXIS 5011, at *5-6 (Tex. App.—Beaumont June 1, 2017, pet. denied) (mem. op.); Tex. Fam. Code Ann. § 161.001(b)(1)(D).
[49]*Id.*; Tex. Fam. Code Ann. § 161.001(b)(1)(E).
[50]*In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet. denied); *see also* Tex. R. App. P. 47.1.

With respect to the child's best interest, there is a strong presumption that the best interest of a child is served by keeping the child with the parent.[51] Yet it is equally presumed the "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest."[52] Under the Family Code, there is a strong presumption that keeping a child with a parent is in the child's best interest.[53] Even so, it is also presumed "the prompt and permanent placement of the child in a safe environment is…in the child's best interest."[54]

In reviewing a parent's challenge to a best-interest finding and when considering the non-exclusive factors in *Holley*, courts focus on the best interest of the child, not the best interest of the child's parent.[55] Additionally, the Department is not required to present evidence

---

[51]Tex. Fam. Code Ann. § 153.131(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[52]Tex. Fam. Code Ann. § 263.307(a).

[53]*Id.* § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with its parent).

[54]Tex. Fam. Code Ann. § 263.307(a)

[55]*Holley*, 544 S.W.3d at 371-72; *In the Int. of H.M.R.J.*, No. 09-22-00171-CV, 2022 Tex. App. LEXIS 8471, at *26 (Tex. App.—Beaumont Nov. 17, 2022, no pet.).

addressing all of the *Holley* factors, and the fact the Department doesn't present evidence on some factors doesn't preclude the trier of fact from forming a strong belief or conviction that terminating the parent's relationship with the child is in a child's best interest, particularly when the evidence is undisputed that the parent endangered the child.[56]

In a best-interest analysis, the evidence that supports a trial court's subsection (D) and (E) finding may also support the trial court's best-interest finding.[57] A trial court's best-interest finding may be based on direct or circumstantial evidence, or it may be based on subjective factors that the trial court may have observed in the trial.[58] When evaluating what is best for a child's future, trial courts may consider a parent's past conduct when that conduct is relevant to the child's best interest.[59] Ultimately, the question is whether the evidence when considered as a whole allowed the trial court to reasonably form a firm belief or conviction

---

[56]*In re C.H.*, 89 S.W.3d at 27.
[57]*In re T.R.S.*, No. 09-18-00482-CV, 2019 Tex. App. LEXIS 4913, at *14 (Tex. App.—Beaumont June 13, 2019, no pet.) (noting that the same evidence that supports a trial court's subsection D and E findings may be relevant to the trial court's best-interest finding).
[58]*Id.*
[59]*Id.*

35

that it was in Hunter's best interest for the trial court to terminate Mother's parental relationship with her child.[60]

The trial court was entitled to consider Mother's past conduct including her conduct before Hunter was born in deciding whether a decision to terminate Mother's parental rights to him would be in Hunter's best interest.[61] At trial, the trial court was entitled to infer from the evidence that Mother's addiction issues were longstanding and persisted even after Hunter was born. For example, the trial court heard testimony that Mother refused to submit to drug tests that the Department asked Mother to take during the pendency of the case even though she was required to submit to the tests under the court-ordered service plan. The trial court also heard testimony that Mother failed to provide the Department with drug tests that demonstrated she was not taking drugs even though she knew that unless she provided the Department with these tests, she couldn't exercise her rights of visitation and see Hunter in the three-month period before the November trial.

---

[60]*In re C.H.*, 89 S.W.3d at 25, 27-28.
[61]*Id.* at 27-28.

When they testified, both the CASA and Hadnot expressed concerns about whether Hunter would be safe were he to be placed in Mother's care given their reservations about whether Mother had gained the ability to control her addiction.

While Mother highlights the evidence in the trial record that is positive, that shows her love for Hunter, that shows she and Hunter had started to form a bond, and that shows she enrolled in a methadone treatment program after the case was filed, that she attended parenting classes, and that shows she enrolled in college, the trial court wasn't required to favor her interests above those of Hunter in placing him promptly and permanently in a safe environment. Mother provided the trial court with no evidence that she could provide Hunter a safe and stable home. To the contrary, the record shows that Mother is unemployed, nothing show she has a home in which Hunter can live, and there is no evidence that she currently has any job skills that will allow her to earn a sufficient income to provide Hunter with a safe and stable home.

On the other hand, the trial court heard Hunter's foster mother testify that Hunter is in a safe environment where he is loved and that she provides for his physical and medical needs. The trial court also heard testimony from the Department's caseworker and the foster mother that the Department's goal for Hunter was to have him adopted by his foster parents and that his foster parents are providing him with a safe and stable home. At trial, Hunter's foster mother testified that she wanted to adopt him.

"While parental rights are of constitutional magnitude, they are not absolute."[62] Simply put, given Mother's historical use of illegal drugs and the seriousness of her addiction, the trial court could have reasonably formed a firm belief or conviction that terminating Mother's parental rights so that Hunter could be promptly and permanently placed in a safe home where his needs can be met is in his best interest.[63]

---

[62] *In re C.H.*, 89 S.W.3d at 28.
[63] *Id.* at 27-28.

38

Conclusion

Having addressed the dispositive issues in Mother's appeal, we overrule Mother's sole issue. Accordingly, the trial court's Order of Termination is,

AFFIRMED.

HOLLIS HORTON
Justice

Submitted on February 6, 2024
Opinion Delivered April 4, 2024

Before Golemon, C.J., Horton and Johnson, JJ.

39